1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICKEY A. BEAVER,

          Plaintiff,

     v.

CITY OF FEDERAL WAY, *et al.*,

          Defendants.

CASE NO.  C05-1938-JPD

MEMORANDUM OPINION AND
ORDER

      The issue squarely presented in this case is at what point, if any, do multiple Taser applications against a suspect constitute excessive force?  After being "tased" five times during the course of an arrest for a residential burglary, plaintiff Rickey Beaver sued defendants Douglas Laird and Heather Castro, two Federal Way police officers, under 42 U.S.C. §1983, claiming that Officer Laird used excessive force in making the arrest and that Officer Castro failed to protect Mr. Beaver from such force.  A three day non-jury trial took place on August 14-16, 2007.  This opinion shall constitute the findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  For the reasons stated below, the Court finds that the first three firings of the Taser did not constitute excessive force by the officers.  However, the Court finds that the fourth and fifth firings of the Taser violated Mr. Beaver's constitutional rights.  Finally, the Court finds that the officers are not liable under the doctrine of qualified immunity.

1

<u>JURISDICTION</u>

2   This court has jurisdiction to hear this matter under 28 U.S.C. §1331, pursuant to claims made

3   under the Fourth Amendment to the United States Constitution and 42 U.S.C. §1983.  Pursuant to 28

4   U.S.C. §636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to have the

5   undersigned Magistrate Judge hear this case.  Dkt. No. 52.

6

<u>BACKGROUND FACTS</u>

7   1.   *The Arrest.*

8   Mr. Beaver is a resident of Federal Way, Washington.  During the evening of August 26 and

9   morning of August 27, 2004, Mr. Beaver had been smoking crack cocaine and marijuana, and had

10  been drinking alcohol.  He testified that around noon, he left where he was staying and headed to the

11  store to get something to eat.  His last recollection of what transpired thereafter starts with a few days

12  later when he was in jail.  Accordingly, the account of the arrest is based largely upon the testimony of

13  the two officers and several eyewitnesses.  Immediately after the arrest of Mr. Beaver, Officers Laird

14  and Castro[1] filled out incident reports and use of force statements.  Witness statements were also

15  taken.  To a limited extent, testimony at trial differed from the nearly-contemporaneous written

16  statements.  The Court places greater weight on the written statements than on the recollections made

17  in court three years later.

18  On August 27, 2004, Federal Way police officer Douglas Laird was dispatched to investigate a

19  report of residential burglary.[2]  The dispatcher advised Officer Laird that no weapons had been seen on

20  the suspect.  Officer Laird testified that he is trained to assume, however, that until proven otherwise,

21  that all suspects might carry weapons.  Officer Laird arrived on the scene and saw Mr. Beaver running.

22

23

[1] Since the arrest, Officer Laird has been promoted to detective.  However, to avoid confusion,
24  the Court will refer to him as Officer Laird since that was his rank at all times relevant to these
proceedings. The same is true of Officer Castro.

25

[2] Mr. Beaver was identified as the suspect in the residential burglary by two witnesses.
26  However in a later trial, he was acquitted by reason of insanity.  He was detained at Western State
Hospital for an unspecified period of time after his trial.

MEMORANDUM OPINION AND ORDER
PAGE - 2

1   He recognized Mr. Beaver as someone he had encountered before. Indeed, Officer Laird knew Mr.

2   Beaver's first name and addressed him as Rickey when he ordered him to halt. Mr. Beaver showed no

3   signs of comprehending Officer Laird's command and it appeared to Officer Laird that he was "under

4   the influence" because Mr. Beaver was sweating, his veins were bulging, and he had a far-off look.

5   Officer Laird further observed that Mr. Beaver was approximately six feet tall, heavyset, and was

6   wearing shorts and a t-shirt that was not tucked in.

7           When he failed to halt, Officer Laird shot Mr. Beaver with the first of what turned out to be

8   multiple Taser applications. There was dispute as to the actual number of applications administered.

9   In his use-of-force report completed after the incident, Officer Laird reported that he thought he had

10  delivered approximately six to seven Taser applications on Mr. Beaver. Ex. 2. The Taser contains a

11  computer chip that records the date and time of each application of the Taser, up to a maximum of

12  585 applications, at which point, the data entered begins to erase and overwrite earlier entries. The

13  Taser includes a data-port connection that permits information on the use of the Taser to be

14  downloaded to a computer.   On July 12, 2006, the data from Officer Laird's M-26 Taser was

15  downloaded. *See* Ex. A-16. The initial attempt to download failed, but a second effort was

16  successful. The data download indicates that Officer Laird's Taser was fired five times against Mr.

17  Beaver on the day in question.[3]  The start[4] of each five second cycle on August 27, 2004 is as set forth

18

19      [3] The data download printout (Ex A-16) identifies 585 times Officer Laird's Taser was fired.
    The firing that appears on line 1 of the printout was identified as the first application used against Mr.
20  Beaver. This is unfortunate, because the download shows all subsequent applications through the July
    12, 2006 date of the data downloads, and then returns to the earliest use of the Taser. The 585th
21  entry is three days prior to the incident in question, and so there is no way to confirm absolutely that
    the application shown on line 1 was the first application of that day, due to the gap. When the Court
22  asked why line 1 began with the date in question, both Officer Myers and Officer William Skinner (the
    Federal Way police officer who conducted the data download) indicated it was simply a coincidence
23  and the date was selected by the computer rather than by any action on their part. There was no
    serious challenge to the evidence proffered in this regard, and consequently the Court adopts the data
24  read-out as the best evidence of the number and timing of the applications at issue.

25      [4] The testimony indicated that the internal clock in the Taser can gain or lose "a few" minutes
26  per month. Therefore, the recorded time of application differs from the actual time of the application.
    However, it is the number of applications and the intervals that are material to this case, and those

MEMORANDUM OPINION AND ORDER
PAGE - 3

1 | below:

2 |         Application 1:          13:24:32

3 |         Application 2:          13:24:53

4 |         Application 3:          13:25:00

5 |         Application 4:          13:25:15

6 |         Application 5:          13:25:42

7 | Ex. A-16.

8 |          Once an application or cycle begins, it continues for a full five seconds.  Accordingly, to

9 | determine the amount of time between the end of one application and the beginning of the next

10 | application, five seconds must be deducted between the differences in the times.  Thus, the time

11 | involved in the incident, from the first application of the Taser through the end of the last application,

12 | was 1 minute and 15 seconds.

13 |          When Mr. Beaver was initially "tased," the darts of the Taser struck plaintiff in his right

14 | shoulder and lower back, and the electrical pulses caused Mr. Beaver's muscles to contract

15 | involuntarily and he fell to the ground.  However, Mr. Beaver then attempted to get up and succeeded

16 | in propping himself up on his elbows before Officer Laird fired his Taser again, sixteen seconds after

17 | the first "tasing."  Mr. Beaver again fell to the ground.  Before the second and after each firing of his

18 | Taser, Officer Laird commanded Mr. Beaver in a loud voice to lie on his stomach and extend his arms

19 | out to his side.  An eyewitness, Melvin Smith, testified credibly that during the incident, he heard Mr.

20 | Beaver say repeatedly "I can't" in response to Officer Laird's commands.[5]

21 |          After the second tasing, Mr. Beaver did not immediately comply with Officer Laird's

22 | commands and was on his back.  Officer Laird tased Mr. Beaver a third time, only two seconds after

23 |

24 | would not have changed.

25 |          [5] In a statement given by Mr. Smith to police shortly after the incident, Mr. Smith also said
that he heard Mr. Beaver say "I can" after he said "I can't."  However, Mr. Smith did not recall Mr.

26 | Beaver saying "I can," when he testified at trial.   Another eyewitness, Mr. Orr, testified that Mr.
Beaver was saying something, but he was not close enough to make out what was being said.

MEMORANDUM OPINION AND ORDER

PAGE - 4

1   the end of the second tasing.  After this third tasing, Officer Castro arrived on the scene.  She

2   observed Mr. Beaver on his side, slowly rolling and resting on one elbow.  Contrary to Officer Laird's

3   command to lie on his stomach, Officer Castro issued a conflicting order to Mr. Beaver, telling him to

4   get on his back.  Officer Laird immediately countermanded that order and told Mr. Beaver to get on

5   his stomach.  Officer Castro also directed Officer Laird to tase Mr. Beaver again, which he did, ten

6   seconds after the end of the third tasing.

7         After the fourth tasing, Mr. Beaver lay on his stomach, as directed by Officer Laird, but his

8   arms were curled under his chest and not extended out to his side.  Twenty-two seconds elapsed

9   before Officer Laird fired the Taser a fifth and final time.  At that point, Mr. Beaver extended his

10  hands out over his head and Officer Laird kicked them down to his side.  Officer Castro grabbed one

11  arm, which plaintiff tensed and then released.  Officer Castro was then able to handcuff Mr. Beaver

12  and the two officers assisted Mr. Beaver to a patrol car.  Mr. Beaver was found to have no weapons

13  on him.  Medical staff removed the Taser's prongs from his body.  Mr. Beaver was transported to the

14  hospital for treatment of the cuts to his eye and leg that he sustained when he fell after being tased.

15         2.  *Background on the Taser.*

16         At this point, it is necessary to provide some background information on the Taser, which is

17  manufactured and sold by Taser International.  Expert testimony about the Taser was offered on

18  behalf of the defendants by Officer Chris Myers of the Seattle Police Department.  He trains Seattle

19  police officers on the use of force, and specifically the use of Tasers.[6]

20  _____

21         [6] The Seattle Police Department was one of the first police departments in the country to adopt
    wide-spread use of the Taser.  Officer Myers testified as an expert wearing two hats.  First, he testified
22  about the reasonableness of the police actions in this case.  Second, he testified as an expert on the
    technical and scientific aspects of the Taser and its capabilities.  He has a business relationship with
23  Taser International.  He is sent by Taser International on trips around the world to promote the use of
    Tasers and instruct police departments on their use.  He also has an ownership interest in a small
24  consulting group that Taser International contracts with for pre-release versions of some of its
    equipment.  He has been named a "Senior Master Instructor Armorer" by Taser International.
25  Apparently, this has been done with the knowledge of the Seattle Police Department.  Unfortunately,
    it was not always clear when Officer Myers was wearing his police officer hat to opine about the
26  reasonableness of the actions taken, and when he was wearing his Taser International consultant hat to

MEMORANDUM OPINION AND ORDER
PAGE - 5

1    The Taser is a weapon that can deliver a maximum of 50,000 volts to a target, but does so at

2    very low amperage.  Upon activation, the Taser fires two darts attached by electrical-conducting wires

3    into the target.  If both darts make contact, a circuit is completed and a five-second electrical charge

4    cycle is initiated.  The cycle is not a continuous flow of electrical current.  Instead, the charge is

5    delivered in the form of electrical pulses.  There are about twelve pulses per second, or approximately

6    sixty pulses per each five-second cycle.  If the darts remain in the target, additional cycles can be

7    delivered by simply re-squeezing the trigger.  The M26 model Taser used by Officer Laird delivered

8    full five second cycles each time it was activated.

9    The Taser is not designed to use pain as a principal motivator.  Instead, the pulses cause a

10   break in the body's central nervous system signaling, resulting in involuntary muscle contractions.

11   This will generally result in the target falling, if standing, or in preventing a target on the ground from

12   standing.  The effect is generally temporary.   Although infliction of pain as a motivator is not the

13   primary function of a properly deployed Taser, pain is a necessary by-product of its use.  However, it

14   is also a very useful tool for law enforcement, as it is considered to inflict considerably less pain on a

15   suspect than other forms of force available to an officer.  Moreover, the Taser is a valuable tool for

16   protecting law enforcement officers by providing an enlarged safety zone around the police officer

17   when confronting a suspect.

18                                              DISCUSSION

19   42 U.S.C. §1983 provides a cause of action against persons acting under color of state law

20   who have violated rights guaranteed by the Constitution or federal statutes.  *Buckley v. City of*

21   *Redding,* 66 F.3d 188, 190 (9th Cir. 1995).  In this case, the parties have stipulated that the defendants

22   had probable cause to arrest the plaintiff.  In addition, Mr. Beaver does not question the propriety of

23   the first tasing that took place or the subsequent decision to place him in handcuffs.  Finally, the

24   parties have stipulated that Officers Laird and Castro were acting under color of state law.  Dkt. No.

25

26
     _____
     promote use of the Taser.
     MEMORANDUM OPINION AND ORDER
     PAGE - 6

101, ¶¶ III.  The issue tried was whether Officer Laird used excessive force when he fired his Taser after the first tasing and, if so, whether  Officer Castro failed to protect Mr. Beaver from this force. The Court addresses each claim in turn.

1.  *Excessive Force.*

The standard for analyzing claims of excessive force was established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).  *Graham* instructs that such claims are to be evaluated under the Fourth Amendment's reasonableness standard:  "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (citation omitted).  The Court cautioned that reasonableness must be assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.*  The Court further held that relevant factors in the reasonableness inquiry include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.

The Ninth Circuit has refined this standard by adding additional considerations.  First, the inquiry should begin with an assessment of "the quantum of force used."  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).  This is so "because the factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."  *Id.* (internal quotation and citation omitted).  In addition, the Ninth Circuit has stated that in assessing the reasonableness of an officer's actions, "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider."  *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994).

Applying these factors to the circumstances of Mr. Beaver's arrest, the Court first finds that

1   the use of a Taser constituted significant force.  While the advent of the Taser has undeniably provided

2   law enforcement officers with a useful tool to subdue suspects with minimal risk of harm to the

3   suspect or the officer, it is equally undeniable that being "tased" is a painful experience.  The model

4   used by Officer Laird delivers a full five-second cycle of electrical pulses of a maximum of  50,000

5   volts at very low amperage that interrupt a target's motor system and cause involuntary muscle

6   contraction.  The device does not typically cause any long-term injury or pain, but Officer Myers, the

7   defendants' expert, admitted that the experience of being tased is painful.  He also testified that after

8   being tased, a suspect may be dazed, disoriented, and experience vertigo.

9          Next the Court turns to the specific factors cited in *Graham*.  The first factor is the severity of

10   the crime at issue.  Mr. Beaver was suspected of having committed residential burglary.  Although

11   burglary is a felony offense, it is not necessarily a violent crime.  Indeed, it often relies more on stealth

12   than on force.  In this case, the 911-dispatcher advised Officer Laird that no weapons had been seen

13   on Mr. Beaver.  The Court recognizes that the dispatcher's report was not conclusive as to whether

14   Mr. Beaver was armed, and also recognizes that tools often used in a burglary, such as  screwdrivers

15   or hammers, can serve a dual purpose as a weapon.  Nevertheless, the fact that Mr. Beaver was

16   initially reported as fleeing a burglary without weapons, as opposed to a suspect fleeing a shooting or

17   an assault, lessens the overall sense of danger surrounding the incident.

18          The second *Graham* factor is whether Mr. Beaver posed an immediate threat to the safety of

19   the officers or others.  The Ninth Circuit has held that this factor is the most important of the three

20   specific factors identified in *Graham*.  *See Chew v. Gates*, 27 F.3d at 1441.  Here, Mr. Beaver never

21   issued any threats to Officer Laird or Officer Castro, either physically or verbally.  He had no visible

22   weapons.  Furthermore, Officer Castro testified that when she arrived, Officer Laird was at a "safe"

23   distance from Mr. Beaver.  To be sure, Mr. Beaver is a large man and Officer Laird testified that the

24   very fact that Mr. Beaver was able to "fight through" the initial tasing made him seem even more

25   threatening.  But Officer Laird was of approximately equal size to Mr. Beaver and was a seven-year

26   veteran of the force at the time of the arrest.  While the Court concedes that the circumstances of the

MEMORANDUM OPINION AND ORDER
PAGE - 8

arrest were, in the words of the *Graham* decision, "tense, uncertain, and rapidly evolving," the Court has difficulty in seeing how Mr. Beaver's prone body, with no apparent weapons, lying a safe distance from Officer Laird, posed an "*immediate* threat" to the officer.

The third *Graham* factor is whether Mr. Beaver was actively resisting arrest or attempting to evade arrest by flight. Initially, Mr. Beaver was attempting to flee and the Court has no trouble concluding that the first tasing was justified to stop him. After the first tasing, and with each additional tasing, however, the issue becomes less clear. Sixteen seconds elapsed between the first and second tasings. During that time, Mr. Beaver appeared to be ignoring Officer Laird's commands – assuming that he understood those commands – and attempting to rise off the ground. Defendants testified that they interpreted Mr. Beaver's actions as "active resistance." Mr. Beaver testified that he could not remember the event itself. Therefore, it is impossible to know what Mr. Beaver's subjective intentions were in failing to heed Officer Laird's commands.

However, an eyewitness testified that he heard Mr. Beaver say repeatedly, "I can't," while he was struggling on the ground. In addition, defendants' expert testified that being shocked by a taser can render a subject disoriented. Thus, Mr. Beaver's actions may have been as much a reaction to being tased as an intentional effort to resist arrest. Furthermore, the period between the second and third tasing was only two seconds. During such a brief time period, it is difficult to see how Mr. Beaver even had the opportunity to comply with Officer Laird's commands.

At this point in the unfolding of the events in question, namely, up to and including the third tasing of Mr. Beaver, the Court finds that Officer Laird was faced with unenviable choices and had to make split-second decisions, and this Court will not second-guess his decision to apply the use of the Taser. The officer was alone with a fleeing felony suspect, who was apparently under the influence of controlled substances, who ignored his commands to stop, and who was attempting to rise and perhaps to flee. "Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Accordingly, the Court finds that under the objective inquiry set forth in *Graham*, Officer Laird's decision to tase Mr. Beaver

MEMORANDUM OPINION AND ORDER
PAGE - 9

1   the first three times was objectively reasonable and did not violate the Fourth Amendment.

2          The analysis changes, however, with the arrival of Officer Castro.  At this point, there were

3   two officers to control the situation.  To the extent that Mr. Beaver posed an "immediate threat" to

4   Officer Laird during the first three tasings, that threat was significantly diminished when Officer Castro

5   arrived to provide backup.  Once Officer Laird had backup, his options increased dramatically.

6   Instead of tasing Mr. Beaver, Officer Laird could have covered Officer Castro while she approached

7   Mr. Beaver and attempted to handcuff him.  If Mr. Beaver resisted, Officer Laird could have fired the

8   Taser again, or if that posed a hazard to Officer Castro,[7] he could have simply moved in to provide

9   manual assistance.  If needed, either officer could have resorted to another form of force such as

10  spraying Mr. Beaver with pepper spray or forcing him to stay down with their knees or baton.

11         Defendants argue, through their own testimony and that of Officer Myers, that Mr. Beaver still

12  posed an unacceptable risk even after Officer Castro arrived.  This assertion is apparently based upon

13  the fact that Mr. Beaver still had not fully complied with Officer Laird's commands when Officer

14  Castro arrived.  Defendants further argue that any option other than using the Taser would have

15  endangered both themselves *and* Mr. Beaver.  They base this argument on the assumption that Mr.

16  Beaver would have actively resisted being handcuffed, and using a baton or physical blows would have

17  inflicted greater injury than the momentary pain of a Taser.  The Court finds defendants' arguments

18  unpersuasive.

19         First, defendants maintain that because Mr. Beaver had not complied with Officer Laird's

20  commands, he was actively resisting arrest and further tasing was warranted.  As previously discussed,

21  the defendants confuse involuntary non-compliance with active resistance.  Officer Castro testified that

22  she believed that non-compliance was the equivalent of a threat.  In light of Mr. Beaver's failure to

23  comply with Officer Laird's multiple commands, his altered state of mind, and his statement "I can't,"

24  ─────────────────

25         [7] Defendants' expert testified at trial that if an officer touches someone while that person is
    getting tased, there is a chance that the officer might become "part of the circuit" and receive some of
26  the electric shock.

MEMORANDUM OPINION AND ORDER
PAGE - 10

1   a reasonable officer would have concluded that Mr. Beaver was unable to comply with the commands

2   given, and that his refusal to do so was at least in part involuntary.  Involuntary actions cannot form

3   the basis of active resistance.  *See Winterrowd v. Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007)

4   (holding that when no immediate threat is posed and suspect's failure to comply may be involuntary,

5   officers were not entitled to use force).

6          In addition, defendants contend that using any option other than the Taser would have posed

7   greater risk to both themselves and Mr. Beaver.  This argument relies on the assumption that Mr.

8   Beaver would have tried to fight them off if they approached him.  At the time of the fourth tasing,

9   Mr. Beaver was rolling on the ground, impaired and obviously dazed, and indicating his inability to

10   comply with the officers' commands.  Defendants essentially ask the Court to accept the proposition

11   that the police should be permitted to use means such as a Taser to shield themselves from any

12   possibility of harm and the suspect must suffer the consequences.  To accept this proposition would

13   effectively eviscerate the protections of the Fourth Amendment and also ignore the teachings of

14   *Graham*, which counsels that a key question in this inquiry is whether a suspect poses an "immediate"

15   threat, not a "possible" threat.[8]

16          This argument also conflicts with the training the officers received that instructs them to use a

17   Taser "Only to Stop a Threat" and that an officer should "Never Use [a Taser] for Physical Coercion."

18   Ex. 7, p. 10.  Notwithstanding this training, Officer Castro testified that it was appropriate to use a

19

20          [8] An example of how defendants stretch "immediate threat" to encompass "possible threat," in

21   the Court's view, is the concern that Officer Laird expressed that Mr. Beaver might have had a
     weapon hidden in the waistband of his pants.  Because Mr. Beaver wore a t-shirt that was not tucked

22   in, Officer Laird could not see Mr. Beaver's waistband and consequently could not ascertain whether
     Mr. Beaver had a knife or gun tucked into his pants.  However, Officer Laird also testified that Mr.

23   Beaver's hands were either visible to him during the incident when he was rolling on his back or were
     curled underneath his chest when he was on his stomach as commanded.  In other words, Officer Laird

24   never saw Mr. Beaver's hands reaching towards his waistband as if to retrieve a weapon.  Thus, the
     danger that Mr. Beaver had a weapon hidden in his pants cannot qualify as an "immediate threat"

25   under *Graham*.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("[A] simple
     statement by an officer that he fears for his safety or the safety of others is not enough; there must be

26   objective factors to justify such a concern.").

1  Taser as often as required to force a suspect to comply with an order and that a suspect's

2  noncompliance with an order should be treated as equivalent to resistance.  The defendants' expert,

3  Officer Myers proffered testimony that the training restriction "Never Use [a Taser] for Physical

4  Coercion" does not really carry with it the plain meaning of the words.  Instead, he stated that this

5  language meant that an officer should not use a Taser to coerce a suspect without a legal basis to do

6  so – *i.e.*, using the Taser to doing something illegal such as forcing a suspect to make an involuntary

7  confession.  To suggest that the words in the training material should so limited is simply another

8  indication of his less than objective perspective regarding use of Tasers.  Therefore, the Court rejects

9  this argument and concludes that under the criteria announced in *Graham* and it progeny, the fourth

10  and fifth tasings of Mr. Beaver were not objectively reasonable in light of the facts and circumstances

11  surrounding the arrest.

12        The Court's analysis of the officers' actions was not assisted by the testimony of either expert.

13  Plaintiff's expert, Sandra Pailca, who is the former head of the Seattle Police Department's Office of

14  Professional Accountability, testified that apart from the initial tasing, all tasings constituted an

15  excessive use of force.  She opined that speaking in a lower tone rather than shouting could have

16  permitted the officer to control the situation better than shouting commands at an obviously dazed and

17  impaired suspect.  It is possible that this could have worked.  However, this opinion ignores the fact

18  that Officer Laird was alone, that Mr. Beaver was disoriented and that after the initial tasing, he was

19  attempting to rise.  It also ignores the holding in *Graham* by impermissibly applying 20/20 hindsight to

20  the officers' actions.

21        Conversely, defendants' expert, Officer Myers, testified that even additional tasings after the

22  fifth would have been appropriate, because Mr. Beaver failed to comply with the officers' commands

23  to extend his arms to his side, which could be properly construed as active resistance.  As discussed

24  above, the Court rejects this argument.  It fails to account for a suspect's physical inability to comply.

25  It also fails to account for the direct threat assessment actually facing the officer.  If the defendants'

26  argument set forth the proper standard for the use of Tasers, it could be used, for example, to justify

MEMORANDUM OPINION AND ORDER
PAGE - 12

1   use of a Taser even upon a person who poses no threat, but who may be engaged in only passive

2   resistance.  This reasoning would not comply with excessive force standards.  Officer Myers sought to

3   justify his approach regarding multiple tasings by use of a training video.  Ex. A-26.  However, even if

4   this training video could be interpreted to illustrate the proper application of force, it does not help the

5   defendants.  The differences are stark.  The video shows an officer confronting an intoxicated driver.

6   The drunk driver attempts to attack the officer, physically struggles with him, is verbally assaultive and

7   actively attempts to flee.  The officer in the video deployed his Taser several times on the driver.

8   However, the officer stopped the Taser applications as soon as the driver is heard to say "I can't."

9   Most importantly, the officer in the video is alone.  Officer Myers is overly-enamored with the Taser

10  weapon.  Even Lt. Shupp, the Federal Way police superior for Officers Laird and Castro,

11  acknowledged that the number of tasings in this case was "unusually high."  In sum, neither expert was

12  helpful or persuasive.

13          2.  *Failure to Protect.*

14          "Police officers have a duty to intercede when their fellow officers violate the constitutional

15  rights of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000)

16  (citation omitted).  Here, Officer Castro not only failed to intercede but affirmatively reinforced

17  Officer Laird's actions by telling him immediately upon her arrival to tase Mr. Beaver again.  She then

18  failed to intercede when Officer Laird tased Mr. Beaver a fifth time.  Accordingly, the Court concludes

19  that Officer Castro, like her colleague Officer Laird, is responsible for subjecting Mr. Beaver to a

20  deprivation of his Fourth Amendment rights.  *See United States v. Koon,* 34 F.3d 1416, 1447 n. 25

21  (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).

22          3.  *Qualified Immunity.*

23          Defendants argue that even if the Court finds that Officers Laird and Castro may have violated

24  Mr. Beaver's constitutional rights, they nonetheless cannot be held liable because they are entitled to

25  qualified immunity.  Qualified immunity protects § 1983 defendants from liability for civil damages if

26  their conduct does not violate a clearly established constitutional or statutory right of which a

MEMORANDUM OPINION AND ORDER
PAGE - 13

1   reasonable person would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

2          In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the test to be applied in

3   evaluating claims of qualified immunity.  The threshold inquiry in a qualified immunity analysis is

4   whether the facts alleged, when taken in the light most favorable to the party asserting the injury, show

5   that the defendant's conduct violated a constitutional right.  *Id*. at 201.  If the reviewing court

6   concludes that no constitutional right was violated by the defendant's conduct, the court need not

7   inquire further.  *Id*.  However, if the reviewing court concludes that a constitutional right was violated,

8   the court must then determine whether the right was clearly established.  *Id*.  The time frame to

9   determine whether the right was clearly established is at the time of the alleged violation of the right,

10  and not the time of the trial of the case.  *See Rodis v. City and County of San Francisco*, __ F. 3d __,

11  2007 WL 2421417 at *3, *6 (9th Cir. August 28, 2007).

12         Here, the Court has found that the first prong of *Saucier* has been satisfied, and that

13  defendants violated Mr. Beaver's Fourth Amendment rights.  The next step is to determine whether

14  the right was clearly established.  This inquiry "must be undertaken in light of the specific context of

15  the case, not as a broad general proposition . . . . [T]he right the official is alleged to have violated

16  must have been clearly established in a more particularized, and hence more relevant, sense:  The

17  contours of the right must be sufficiently clear that a reasonable official would understand that what he

18  is doing violates that right."  *Id.* at 201-02.  However, even in the absence of directly analogous case

19  law, if the actions taken were not only unconstitutional, but patently so, the officer will be deemed to

20  have violated clearly established statutory or constitutional rights of which a reasonable person would

21  have known.  *See Cunningham v. Gates*, 229 F.3d at 1290.

22         After reviewing the case law, the Court concludes that in 2004, when Mr. Beaver was arrested,

23  the contours of Fourth Amendment jurisprudence and, in particular, excessive force claims of this

24  type, were not sufficiently clear that a reasonable officer would have understood that multiple tasings

25  of Mr. Beaver under these circumstances violated his rights.  Most of the decisions finding police

26  officers liable involve facts that are much more egregious than those presented in this case.  For

MEMORANDUM OPINION AND ORDER
PAGE - 14

example, in *Davis v. City of Las Vegas*, the Ninth Circuit found that a police officer used excessive force when he slammed an unarmed suspect head-first against a wall, thereby breaking his neck, and then threw the suspect onto the floor, kneed him in the back, and punched him in the face. 470 F.3d. at 1055. Nevertheless, there are some decisions that involve situations similar to the instant case, where the use of force by the police was less severe than that in *Davis,* and the suspect's actions were analogous.

In *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc), for instance, the Ninth Circuit found that defendants were not entitled to summary judgment when the evidence, viewed in the light most favorable to plaintiff, established that police officers released a police dog against the plaintiff while he was already pinned to the ground. *Id.* at 702. Although the Ninth Circuit observed that plaintiff had continually ignored the officers' requests to place his hands on his head, the court found that plaintiff's resistance was not particularly "bellicose" and did not justify the officers' use of force. *Id.* at 703. Similarly, in *Harveston v. Cunningham*, 216 Fed. Appx. 682, 2007 WL 34424 (9th Cir. 2007), the Ninth Circuit found that a police officer used excessive force when he used pepper spray against a suspect who was already handcuffed and on the ground, but who was trying to roll over and stand up. *Id.* at 685, *3.[9] *Smith* and *Harveston* support the proposition that police officers may not use force when, as here, a suspect is not a threat, even if the suspect is not fully complying with the officer's commands. However, both cases were decided *after* Mr. Beaver's arrest. Accordingly, they cannot serve as a basis for finding that the Fourth Amendment rights violated by Officers Laird and Castro were clearly established in August of 2004. In addition, even in the absence of directly relevant case law, the Court cannot say that the defendants' actions were so patently unconstitutional that they should be deemed to have violated clearly established statutory or constitutional rights. *See Cunningham v. Gates*, 229 F.3d at 1290.

_____

[9] *Harveston* is an unpublished decision by the Ninth Circuit. However, Federal Rule of Appellate Procedure 32.1 and Ninth Circuit Rule 36-3 permit its citation because the *Harveston* opinion was issued after January 1, 2007.

MEMORANDUM OPINION AND ORDER
PAGE - 15

1    Therefore, the Court finds that at the time of the arrest, a reasonable law enforcement officer

2    might well have failed to recognize that the actions taken by defendants – specifically, the fourth and

3    fifth tasings of Mr. Beaver – violated his Fourth Amendment rights.  Under the second prong of

4    *Saucier*, the officers are entitled to qualified immunity.

5    In part, the purpose of the two-prong *Saucier* analytical framework is to force courts to

6    establish contours of the law involving potential violations of civil rights.  *See Saucier*, 533 U.S. at

7    201 (observing that the second prong of the test "serves to advance understanding of the law. . . .").

8    In this case, because the case law on use of Tasers is not well developed, liability for violations of Mr.

9    Beaver's rights caused by the fourth and fifth tasings cannot be imposed.  It has been said that

10   qualified immunity exists because police officers "cannot be expected to predict what federal judges"

11   might decide is constitutionally unacceptable.  *See Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.

12   1981) (citation and internal quotation omitted).  However, at least as far as the undersigned is

13   concerned, the following issues are now clearly established.  First, the use of a Taser involves the

14   application of force.  Second, each application of a Taser involves an additional use of force.  Third,

15   multiple applications of a Taser cannot be justified solely on the grounds that a suspect fails to comply

16   with a command, absent other indications that the suspect is about to flee or poses an immediate threat

17   to an officer.   This is particularly true when more than one officer is present to assist in controlling a

18   situation.  Fourth, any decision to apply multiple applications of a Taser must take into consideration

19   whether a suspect is capable of complying with an officer's commands.

20

21

22

23

24

25                                              <u>CONCLUSION</u>

26   The Court finds that the defendants violated plaintiff's rights under the Fourth Amendment as a

MEMORANDUM OPINION AND ORDER
PAGE - 16

1    result of the fourth and fifth tasings.  The Court also finds that tasings one, two and three did not

2    violate the plaintiff's rights.  Finally, the Court also finds that the individual defendants are shielded by

3    qualified immunity and are not liable.  The Clerk shall enter judgment in favor of the defendants.

4         DATED this 31st day of August, 2007.

5

6                                             _James P. Donohue_

7                                             JAMES P. DONOHUE
                                              United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MEMORANDUM OPINION AND ORDER
PAGE - 17